917 So.2d 383 (2005)
STATE of Florida, Appellant,
v.
John Anthony RUBIO, Sonia B. Guzman, et al., Appellee.
No. 5D05-846.
District Court of Appeal of Florida, Fifth District.
December 30, 2005.
*387 Charles J. Crist, Jr., Attorney General, Christopher M. Kise, Solicitor General and James A. McKee, Deputy Solicitor General, Tallahassee, for Appellant.
G. Richard Strafer of G. Richard Strafer, P.A., Miami, for Appellee.
SHARP, W., J.
This case involves charges of Medicaid provider fraud, patient brokering, racketeering and white collar crimes against various defendants, who are all engaged in the field of dentistry. The trial court dismissed most of the charges against the defendants and struck the predicate incidents used by the state to support the remaining charges. In so doing, the trial court declared Florida's patient brokering law and the version of Florida's Medicaid provider fraud law applicable to this case unconstitutional. We disagree with the trial court concerning Florida's patient brokering law and conclude that statute is constitutional. In all other respects, we affirm the trial court.

Factual and Procedural Background
In October 2003, the state filed a 130 count information against appellees Sonia Guzman and Anamaria Mendez and three co-defendants John Rubio, Iliana Martin-Fernandez[1] and Gustavo Fernandez. Counts 1 and 2 charged all defendants with racketeering and conspiracy to commit racketeering in violation of section 895.03, Florida Statutes. Counts 3-55 charged various defendants with Medicaid provider fraud in violation of section 409.920(2)(a), Florida Statutes. Counts 56-129 charged various defendants with patient brokering by engaging in a split-fee arrangement in violation of section 817.505, Florida Statutes. Count 130 charged all defendants with violating the White Collar Crime Victim Protection Act, section 775.0844, Florida Statutes.
Guzman and Mendez are dentists who operated a dental office in Miami. According to the state, they were recruited to come to Orlando to provide dental services to Medicaid-eligible children. Rubio and Gustavo Fernandez solicited these children primarily from public housing areas and transported them to and from the clinic. The dentists billed Medicaid and split the fees with Rubio. Five Medicaid recipients were examined by a pediatric dentist who found no evidence to support the claims submitted on their behalf.
According to the defendants, the fee arrangement was actually between their corporations  Bonilla Professional Services operated by the dentists and Dental Management, Inc., a dental practice management company owned by Rubio. Rubio's company markets for the dental practice, handles the business aspects of the dental practice and lets the dentists do the clinical work. In return for getting a turnkey dental office and marketing, Rubio's company is paid between 42% and 43% of the compensation received by the dentists for their services. The defendants consider this to be a legitimate dental practice management fee.
The defendants moved to dismiss counts 3-55 and to strike the predicate incidents of counts 1, 2 and 130 on the basis that section 409.920(2)(a) is unconstitutional. The defendants argued that the version of section 409.920 applicable to them criminalized even the negligent filing of a false Medicaid statement. Since the Medicaid Act and federal regulations require an elevated *388 mens rea standard of willfulness to support criminal prosecutions, Florida's prosecution of the same conduct under this lesser standard would be unconstitutional under the Supremacy Clause. In support, the defendants relied on State v. Harden, 873 So.2d 352 (Fla. 3d DCA 2004) in which the Third District held that another part of section 409.920  the anti-kickback provision in subsection (2)(e)  was preempted under the Supremacy Clause.
The defendants also filed a motion to strike the fee-splitting arrangement incidents from counts 1, 2 and 130 on the basis the patient brokering statute (section 817.505) does not meet the statutory definitions of racketeering activity or white collar crime. In that motion, the defendants also sought dismissal of counts 56-129 on two grounds: 1) the state has improperly charged multiple counts of patient brokering and 2) section 817.505(1)(a) is unconstitutional because it is vague and criminalizes any fee-splitting arrangement without requiring any form of mens rea.
The trial court agreed with the defendants and struck the predicate incidents from counts 1, 2 and 130, dismissed counts 3-55 on the ground that 409.920(2)(a) is unconstitutional and dismissed counts 56-129 on the grounds that they are multiplicitous and section 817.505(1)(b) is unconstitutional. The court concluded that because Congress intended a willfulness mens rea standard for a criminal prosecution for making false statements and paying kickbacks, Florida cannot criminalize the same behavior under a lesser standard.

Medicaid Provider Fraud
The defendants were charged with committing Medicaid provider fraud at various times in 1999-2002 in violation of section 409.920(2)(a):
409.920. Medicaid provider fraud
(2) It is unlawful to:
(a) Knowingly make, cause to be made, or aid and abet in the making of any false statement or false representation of a material fact, by commission or omission, in any claim submitted to the agency or its fiscal agent for payment.
At the time relevant to this case, section 409.920(1)(d) defined "knowingly" as follows:
(1)(d) "Knowingly" means done by a person who is aware or should be aware of the nature of his or her conduct and that his or her conduct is substantially certain to cause the intended result. (emphasis added)
Effective July 2004, the Legislature redefined "knowingly" to include "willfully" or "willful." Ch.2004-344, § 8, Laws of Fla. Section 409.920(1)(d) currently provides:
(1)(d) "Knowingly" means that the act was done voluntarily and intentionally and not because of mistake or accident. As used in this section, the term "knowingly" also includes the word "willfully" or "willful" which, as used in this section, means that an act was committed voluntarily and purposely, with the specific intent to do something that the law forbids, and that the act was committed with bad purpose, either to disobey or disregard the law.
The present definition is now in accord with the federal intent requirement:
42 U.S.C.A. § 1320a-7b. Criminal penalties for acts involving Federal health care programs
(a) Making or causing to be made false statements or representations
Whoever
(1) knowingly and willfully makes or causes to be made any false statement or representation of a material fact in any application for any benefit or payment under a Federal health care program *389 shall ... (i) in the case of such a statement, representation, concealment, failure, or conversion by any person in connection with the furnishing (by that person) of items or services for which payment is or may be made under the program, be guilty of a felony and upon conviction thereof fined not more than $25,000 or imprisoned for not more than five years or both, or (ii) in the case of such a statement, representation, concealment, failure, conversion, or provision of counsel or assistance by any other person, be guilty of a misdemeanor and upon conviction thereof fined not more than $10,000 or imprisoned for not more than one year, or both ... (emphasis added)
The defendants argued below that the definition of "knowingly" applicable to them included mere negligence, thus rendering section 490.920(2)(a) unconstitutional under the Supremacy Clause[2] because it established a mens rea requirement lower than the federal standard. The trial court agreed that section 409.920(2)(a) was preempted by federal law. The court reasoned that since Congress established the Medicaid program[3] and limited criminal liability to "willful" conduct, Florida cannot criminalize the same behavior under a lesser "knowingly" standard.
In reaching its decision, the court relied on State v. Harden, 873 So.2d 352 (Fla. 3d DCA 2004). In Harden, the defendants were charged with racketeering, conspiracy to commit racketeering, and Medicaid fraud. The state alleged the defendants violated section 409.920(2)(e), the "anti-kickback" provision of section 409.920, by paying drivers a per head fee or commission for the solicitation and transportation of Medicaid eligible children to dental facilities for treatment.
The trial court concluded subsection (2)(e) was unconstitutional on preemption grounds and dismissed the information. On appeal, the Third District agreed the statute was unconstitutional:
[T]here are two significant differences between the federal anti-kickback statute and the Florida anti-kickback statute. First, the federal statute contains several so-called "safe harbor" provisions that exclude certain types of payments from being considered "illegal remuneration." 42 U.S.C. § 1320a-7b(b)(3)(2000). Specifically, 42 U.S.C. § 1320a-7b(b)(3)(B)(2000) protects employer-employee payments for the provision of covered items or services from criminal prosecution. The federal medicaid statutes require participating states to provide transportation to those eligible for dental services. 42 U.S.C. *390 § 1396a(a)(43)(2000); § 409.905(12), Fla. Stat. (2000). Therefore, the Florida anti-kickback statute without any "safe harbor" provisions criminalizes certain activity that is protected under the federal anti-kickback statute and stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.
Secondly, the federal anti-kickback statute contains a "knowing and willful" mens rea requirement. Under federal law, "in order to establish a `willful' violation of a statute, `the Government must prove that the defendant acted with knowledge that his conduct was unlawful.'" In contrast, Florida's anti-kickback statute only requires that the defendant act "knowingly." In turn, "knowingly" is defined as "done by a person who is aware or should be aware of the nature of his or her conduct and that his or her conduct is substantially certain to cause the intended result." § 409.920(1)(d), Fla. Stat. (2000). This Florida definition of "knowingly" would include "mere negligence," thereby criminalizing activity that the federal statute intended to protect. Hanlester Network v. Shalala, 51 F.3d 1390, 1399 n. 16 (9th Cir.1995)("The legislative history demonstrates that Congress, by use of the phrase `knowingly and willfully' to describe the type of conduct prohibited under the anti-kickback laws, intended to shield from prosecution only those whose conduct `while improper, was inadvertent.'"). Again, enforcement of the Florida anti-kickback statute would stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. (citations omitted)
873 So.2d at 354-355.
A year later, the Third District revisited Harden in State v. Wolland, 902 So.2d 278 (Fla. 3d DCA 2005). In that case, as here, the defendant was charged with numerous counts of filing false Medicaid claims in violation of section 490.920(2)(a). Applying the analysis outlined in Harden, the trial court concluded that section 409.920(2)(a) was preempted by federal law and dismissed those counts.
On appeal, a different panel of the Third District, purporting to use the same standard employed in Harden, concluded that Wolland's claim of preemption should have been rejected. In reaching its decision, the court noted there was no express preemption and no indication that Congress intended for the federal government to occupy this field exclusively. Thus the court looked to whether section 409.920(2)(a) "stands as an obstacle to the execution and accomplishment of the objectives and goals of Congress" to determine whether preemption by implication should be found. For a number of reasons, the court concluded that subsection 409.920(2)(a) was not preempted.
First, the court presumed against preemption, a presumption it considered particularly strong because the federal and state false claims legislation share common goals. Second, the court noted that the filing of a false Medicaid claim is frequently prosecuted under 18 U.S.C. § 287, the Federal False Claims Act, which, like subsection 409.920(2)(a), contains no express willfulness requirement.[4]
*391 According to the court, prosecution under the Federal False Claims Act has proceeded notwithstanding its lack of an express willfulness requirement because it is implicit in the filing of a knowingly false claim that the claimant intends to defraud the government and hence it is unnecessary to charge willfulness separately. Thus, the concern in Harden that the Florida definition of "knowingly" might encompass mere negligence, thereby criminalizing activity that the federal statute may have intended to protect, is not present when considering section 409.920(2)(a). "Simply put, one cannot negligently `[k]nowingly make ... [a] false statement... in [a] claim submitted to the agency... for payment.'" 902 So.2d at 284-285.
As the court explained:
Subsection 409.920(2)(a) is, therefore, in harmony with the principles applicable to prosecutions under the federal false claims enactments. By its terms, subsection 409.920(2)(a) proscribes presentation of a claim with knowledge that the claim is false and thereby precludes prosecution for unintended violations. Interpreting "knowingly" as implicitly including willful behavior does no more than give a fair construction to the term as used in subsection 409.920(2)(a). Moreover, in concluding that "knowingly" describes the same behavior as that done "willfully"as our legislature has since clarified we do no more than follow a basic precept of both Florida and federal criminal law. As the Florida Supreme Court in Chicone v. State, 684 So.2d 736, 743-44 (Fla.1996), confirmed, we will ordinarily presume, absent an express indication of a contrary intent, that the Legislature intends a statute defining a criminal violation to contain a mens rea requirement, even when expressly silent on the subject. "[A]n express provision dispensing with guilty knowledge will always control, of course, since in that instance the Legislature will have made its intent clear," but in the absence of such a provision, a criminal statute will be presumed to include a broad applicable scienter requirement...
902 So.2d at 285.
The court then distinguished Harden and limited its application to that case:
In sum, considering the objective of Congress to limit and punish health care fraud (footnote omitted) and considering the language used in subsection 409.920(2)(a), we conclude that notwithstanding the failure of that subsection to contain the term "willfully," the federal and state enactments regarding false claims are in harmony in purpose and effect, and the charges at issue should not have been dismissed as preempted by federal law. Any statement to the contrary in Harden, is not, therefore, determinative and should be limited to that case especially since this court's opinion in Harden clearly turned on the absence of safe harbor provisions in Florida's legislation.
902 So.2d at 286.
In the present case, the state charged that the defendants "did knowingly make, cause to be made, or aid and abet in making of any false statement or false representation of a material fact, by commission or omission, in any claim submitted to the Agency for Health Care Administration or its Fiscal Agent for payment..." Under the definition of "knowingly" applicable to the defendants, the state could prove these charges by simply showing the defendants should have been aware of the nature of their conduct.
*392 By permitting prosecution based on what a provider should be aware of, section 409.920(2)(a) allows convictions for conduct that may be improper but was inadvertent. This is precisely the opposite of what Congress intended. See Hanlester Network v. Shalala, 51 F.3d 1390, 1399 n. 16 (9th Cir.1995) (by using phrase "knowingly and willfully" to describe prohibited conduct under the anti-kickback laws, Congress intended to shield from prosecution those whose conduct "while improper, was inadvertent"). Thus, Florida's false statement provision conflicts with federal law just as much as the anti-kickback provision struck down in Harden.
We respectfully disagree with Wolland that one cannot negligently "knowingly" make a false statement. This view misapprehends the impact of the "should be aware" language in section 409.920(1)(d). Under section 409.920(1)(d), "knowingly" may mean either actual knowledge or negligence. Wolland acknowledged the Legislature had amended the definition of "knowingly" but simply noted the new definition did not apply. It seems to us that the Legislature was attempting to remedy the constitutional infirmity in the prior definition by redefining "knowingly" to correspond to the federal mens rea requirement.
Unlike the statute prohibiting patient brokering, section 409.920 involves only Medicaid provider fraud. Congress has mandated a knowing and willful standard for Medicaid fraud violations. Prosecuting health care providers in Florida for mere negligence in filing claims may cause providers to simply refuse to treat Medicaid patients. Thus Florida's lesser intent requirement clearly "stands as an obstacle to execution and accomplishment of the objectives and purpose" of the Medicaid program. We agree with the trial court that the prior definition of "knowingly" in section 409.920(1)(d) rendered section 409.920(2)(a) unconstitutional and counts 3-55 were properly dismissed.

Patient Brokering
The defendants were charged in counts 56-129 with patient brokering in violation of section 817.505. Section 817.505 provides in part as follows:
817.505. Patient brokering prohibited; exceptions; penalties
(1) It is unlawful for any person, including any health care provider or health care facility, to:
(a) Offer or pay any commission, bonus, rebate, kickback, or bribe, directly or indirectly, in cash or in kind, or engage in any split-fee arrangement, in any form whatsoever, to induce the referral of patients or patronage from a health care provider or health care facility;
(b) Solicit or receive any commission, bonus, rebate, kickback, or bribe, directly or indirectly, in cash or in kind, or engage in any split-fee arrangement, in any form whatsoever, in return for referring patients or patronage to a health care provider or health care facility; or
(c) Aid, abet, advise, or otherwise participate in the conduct prohibited under paragraph (a) or paragraph (b).
* * *
(3) This section shall not apply to:
(a) Any discount, payment, waiver of payment, or payment practice not prohibited by 42 U.S.C. s. 1320a-7b(b) or regulations promulgated thereunder.
(b) Any payment, compensation, or financial arrangement within a group practice as defined in s. 456.053, provided such payment, compensation, or arrangement is not to or from persons who are not members of the group practice.

*393 (c) Payments to a health care provider or health care facility for professional consultation services.
(d) Commissions, fees, or other remuneration lawfully paid to insurance agents as provided under the insurance code.
(e) Payments by a health insurer who reimburses, provides, offers to provide, or administers health, mental health, or substance abuse goods or services under a health benefit plan.
(f) Payments to or by a health care provider or health care facility, or a health care provider network entity, that has contracted with a health insurer, a health care purchasing group, or the Medicare or Medicaid program to provide health, mental health, or substance abuse goods or services under a health benefit plan when such payments are for goods or services under the plan. However, nothing in this section affects whether a health care provider network entity is an insurer required to be licensed under the Florida Insurance Code. [Section 624.01 et seq.]
(g) Insurance advertising gifts lawfully permitted under s. 626.9541(1)(m).
(h) Commissions or fees paid to a nurse registry licensed under s. 400.506 for referring persons providing health care services to clients of the nurse registry.
(i) Payments by a health care provider or health care facility to a health, mental health, or substance abuse information service that provides information upon request and without charge to consumers about providers of health care goods or services to enable consumers to select appropriate providers or facilities ...
(4) Any person, including an officer, partner, agent, attorney, or other representative of a firm, joint venture, partnership, business trust, syndicate, corporation, or other business entity, who violates any provision of this section commits a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.
The trial court dismissed the patient brokering charges on the basis that section 817.505(1)(b) is unconstitutional. We are hampered in our analysis of this issue because the trial court failed to state its reasons for doing so. On appeal, the defendants argue section 817.505(1)(a)[5] is unconstitutional because it is: 1) void for vagueness, 2) lacks any form of mens rea, 3) does not require "willfulness" and 4) violates the First Amendment. We briefly address these matters below.

1. Vagueness.
As generally stated, the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement. Kolender v. Lawson, 461 U.S. 352, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983).
The defendants argue that on its face, section 817.505 fails to define the specific crime charged in this case with sufficient precision so that ordinary people can understand what conduct is prohibited. The defendants claim the statute provides no guidance for when a management/marketing arrangement will be considered a felony. According to the defendants, the payment of a percentage fee is often the fair market value of the services rendered. In such a situation, there is a real and *394 obvious danger of convicting individuals who are engaging in apparently innocent activity.
In discussing the defendants' multiplicity argument, the trial court concluded section 817.505 is not vague. We agree. The requirement that the split-fee arrangement be for the purpose of inducing or in return for the referral of patients distinguishes this arrangement from lawful arrangements and provides sufficient notice of the type of arrangement that is prohibited.

2. Mens Rea.

The defendants contend that section 817.505(1) is unconstitutional because it has no mens rea or intent element. "The existence of a mens rea is the rule of, rather than the exception to, the principles of Anglo-American criminal jurisprudence." United States v. U.S. Gypsum Co., 438 U.S. 422, 436, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978), quoting Dennis v. United States, 341 U.S. 494, 500, 71 S.Ct. 857, 95 L.Ed. 1137 (1951). While strict-liability offenses are not unknown to the criminal law and do not invariably offend constitutional requirements, they are generally viewed with disfavor. U.S. Gypsum Co., 438 U.S. at 437-438, 98 S.Ct. 2864.
According to the defendants, the United States Supreme Court has approved the complete elimination of a mens rea requirement only in the narrow field of public welfare offenses. In these cases, Congress has rendered criminal a type of conduct that a reasonable person should know is subject to stringent public regulation and may seriously threaten the community's health or safety. See Liparota v. United States, 471 U.S. 419, 105 S.Ct. 2084, 85 L.Ed.2d 434 (1985).
For example, United States v. Freed, 401 U.S. 601, 91 S.Ct. 1112, 28 L.Ed.2d 356 (1971), involved a federal statute that made it illegal to receive or possess an unregistered hand grenade. In holding that the government did not have to prove the defendants knew the hand grenades were unregistered, the Court noted that "one would hardly be surprised to learn that possession of hand grenades is not an innocent act." 401 U.S. at 609, 91 S.Ct. 1112. See also United States v. Dotterweich, 320 U.S. 277, 64 S.Ct. 134, 88 L.Ed. 48 (1943) (conviction for shipping adulterated and misbranded drugs affirmed even though statute did not require awareness of wrongdoing).
The defendants contend that section 817.505 cannot be compared to these public welfare offenses. The defendants claim the act being criminalized here merely involves a financial arrangement, not intrinsically dangerous products such as adulterated drugs or grenades.
Moreover, the defendants argue there is confusion in the statutes and regulations as to exactly what type of business arrangements are permitted. Compare Practice Management Associates, Inc. v. Gulley, 618 So.2d 259 (Fla.2d DCA 1993) (contract under which chiropractors agreed to pay management firm ten percent of their weekly gross income or weekly fee of $75 in return for management consulting services did not violate fee splitting provision), with Gold, Vann & White, P.A. v. Friedenstab, 831 So.2d 692 (Fla. 4th DCA 2002), rev. denied, 874 So.2d 1191 (Fla.2004) (service agreement between physician and medical management company was an illegal fee splitting arrangement).
Finally, the defendants claim that section 817.505 conflicts with Board of Dentistry Rule 64B5-17.013(4). That rule provides that a dentist may enter into an agreement with a nondentist to receive "Practice Management Services." The *395 term "Practice Management Services" is defined to include consultation or services regarding the suitability of office space and equipment, the staff necessary to operate a dental office, methods to increase productivity, marketing plans and advertising.
The trial court expressly found that "[v]arious combinations of the defendants referred or provided patients to one another in return for a split of the resulting fee." (emphasis added). We conclude this conduct clearly constitutes split-fee patient brokering and is proscribed by the plain and ordinary language of section 817.505, as well as Board of Dentistry Rule 64B5-17.013(4). Section (5)(f) of that rule expressly provides that practice management agreements between dentists and nondentists shall not "Directly or indirectly condition the payment or the amount of the management fee on the referral of patients, and in addition, the management fee shall reasonably relate to the fair market value of the services provided."
Likewise, the cases cited by the defendants do not support their arguments. For example, the court in Gulley stated: "The plain language of the Florida Statutes clearly prohibits fee splitting solely for the referral of patients." 618 So.2d at 261. However, apparently the management firm in Gulley did not refer patients to the chiropractors. Thus, the agreement in Gulley, unlike the case here, was not unlawful.

3. Willfulness.
The defendants contend that "willfulness" is required under Harden and without that requirement, the statute is unconstitutional. In Harden, the court held the anti-kickback provision of 409.920 was unconstitutional in part because it did not have a "willfulness" requirement. The defendants contend that section 817.505 is nothing more than a disguised anti-kickback statute and likewise must have a willfulness requirement.
According to Wolland, Harden was based primarily on the lack of a "safe harbor" in section 409.920. In contrast, section 817.505 has a safe harbor. Section 817.505(3)(a) specifically provides that the statute does not apply to any payment practice not prohibited by 42 U.S.C. s. 1320a-7b(b). Unfortunately for the defendants, payment schemes for the referral of patients are prohibited under 42 U.S.C. s. 1320a-7b(b).[6] Thus, Harden, as limited by Wolland, does not support striking down section 817.505.

4. First Amendment.
The defendants contend section 817.505(1)(b) is unconstitutional because it *396 criminalizes commercial speech without requiring any intent to defraud. According to the defendants, Florida cannot, consistent with the First Amendment, prevent dentists from using non-dentists to provide practice management services, including marketing and advertising, for the purpose of soliciting business simply because that business comes from Medicaid-eligible patients. Absent an element of fraud, they argue such conduct is constitutionally protected under the First Amendment.
In support, the defendants cite State v. Bradford, 787 So.2d 811 (Fla.2001). In that case, the Florida Supreme Court held that section 817.234(8), which made it unlawful for any person to solicit business for the purpose of making motor vehicle tort claims or claims for PIP benefits, violated the First Amendment because it prohibited solicitation regardless of whether fraudulent intent was involved.
In contrast to the statute at issue in Bradford, section 817.505 does not inhibit a person's right generally to solicit business. Section 817.505 merely prohibits the solicitation and referral of patients in return for payment, which seems to us to be a valid legislative objective, and does not prohibit routine advertising and marketing.
Unlike section 409.920, section 817.505 does not pose the same constitutional concerns. The statute is not vague and clearly prohibits fees based on the referral of patients. The statute does not prohibit the right to solicit business but regulates that right by prohibiting the payment of fees based on patient referrals.
The statute provides a "safe harbor," that is, the section does not apply to payment practices allowed by federal law. However, federal law likewise prohibits payments based on the referral of patients. Furthermore, the prohibition against patient-brokering is not limited to situations involving Medicaid or federal programs. And finally, unlike the filing of a false statement, it seems unlikely that a person could negligently or inadvertently "engage" in a split-fee arrangement. For these reasons, the defendants' constitutional challenges to section 817.505 should have been rejected by the trial court.

Multiplicity
The defendants were charged in counts 56-129 with engaging in split-fee arrangements in violation of section 817.505(1)(b) and (c):
(1) It is unlawful for any person, including any health care provider or health care facility, to:
(a) Offer or pay any commission, bonus, rebate, kickback, or bribe, directly or indirectly, in cash or in kind, or engage in any split-fee arrangement, in any form whatsoever, to induce the referral of patients or patronage from a health care provider or health care facility;
(b) Solicit or receive any commission, bonus, rebate, kickback, or bribe, directly or indirectly, in cash or in kind, or engage in any split-fee arrangement, in any form whatsoever, in return for referring patients or patronage to a health care provider or health care facility ...
(c) Aid, abet, advise, or otherwise participate in the conduct prohibited under paragraph (a) or paragraph (b). (emphasis added)
At the hearing on the defendants' motions, the prosecutor explained why the state had charged the defendants with numerous violations:
[M]y understanding of what the Court will hear is, that [Guzman and Mendez] had an arrangement to come up to do dentistry on weekends. Every other weekend or every weekend, occasionally, they'd would come up to Orlando from *397 their normal base of operations, which is in Dade County, and that all of the patients that they saw during that period of time, and all of the work that they did on those patients that they saw during that period of time, they were all bundled together, batched together into one document, which was  or it  maybe one document is the wrong way of saying this, because it was basically one transaction, but there may have been different documents. But it was basically everything sent up at once at the end of the weekend  or two or three days after the end of the weekend when the paperwork was done. That is how the Information is drafted; that every single time they put all those patients' records together, they attempted to get money out of the State of Florida based on the fact that those patients had been brought in there by Mr. Rubio, and that Mr. Rubio was being paid for no other purpose than to provide those patients and the place for those patients to be worked on, and that there was no rational relationship between the services that Mr. Rubio was providing and the amount of money that was being paid to him and, in fact, that he was being paid half of the revenues minus the expenses. That's the patient brokering that we're talking about.
Now, each of those agreements  each of those times that they agreed to do this, that a  that's a split fee arrangement from the State's point of view.
The trial court dismissed these counts on the ground they were multiplicitous. "Multiplicity" occurs when the state charges a single offense in more than one count, an action which raises double jeopardy concerns. Bautista v. State, 863 So.2d 1180 (Fla.2003); Wallace v. State, 724 So.2d 1176 (Fla.1998); McKnight v. State, 906 So.2d 368 (Fla. 5th DCA 2005). Where the defendants are charged with multiple violations of the same statute, as is the case here, the courts apply the "allowable unit of prosecution" standard to determine whether a double jeopardy violation has occurred. Id.
The determination of the allowable unit of prosecution is a task of statutory construction. Bautista; Wallace; McKnight. If the Legislature fails to establish the unit of prosecution clearly and without ambiguity, the courts must resolve any doubt as to legislative intent by application of the rule of lenity.[7]Bautista; McKnight; State v. Oehling, 750 So.2d 109 (Fla. 5th DCA 1999).
To discern legislative intent, the courts apply a common-sense approach which requires consideration of the statutory language, the purpose of the statute, the evil to be corrected, the legislative history, and the pertinent case law that has applied the statute or similar enactments. Bautista; McKnight. Included within this common sense approach is the "a/any test." Bautista; Wallace; Marin v. State, 684 So.2d 859 (Fla. 5th DCA 1996).
When the article "a" is used by the Legislature in the text of the statute, the intent of the Legislature is clear that each discrete act constitutes an allowable unit of prosecution. Bautista; Marin. However, use of the adjective "any" indicates an ambiguity that may require application of the rule of lenity. Bautista; Wallace; McKnight.
*398 In section 817.505, the Legislature has prohibited "any split fee arrangement." The word "arrangement" is commonly defined as "an informal agreement or settlement ..." Merriam-Webster On-line Dictionary. By its plain wording, section 817.505 would seem to apply only to the agreement to refer patients to the dentists in return for a split of the fees. Submitting the paperwork for payment is simply in furtherance of this agreement or arrangement. We discern no intent by the Legislature to criminalize each and every act done pursuant to the agreement.
However, if "any split fee arrangement" were not considered clear in its scope, we would have to conclude this language is ambiguous. It could refer to the arrangement as a whole, as the defendants argue, or to each time the defendants "arranged" to refer patients and submitted requests for payment, as the state argues. Under the rule of lenity, we must construe the statute in favor of the defendants. Furthermore, the Legislature's use of "any" to modify "arrangement" indicates an ambiguity requiring application of the rule of lenity.
Since the multiple charges of patient brokering filed against the defendants exceeded the "allowable unit of prosecution," the trial court properly dismissed those counts. See Wallace v. State, 724 So.2d 1176 (Fla.1998) (defendant could be convicted of only one count of resisting an officer even though he punched one officer and attempted to punch another officer during his arrest where statute prohibited resisting "any" officer); State v. Watts, 462 So.2d 813 (Fla.1985) (defendant who possessed two knives could be charged with only one count of possession of contraband in a correctional institution where prohibited article was described as "any ... weapon"); State v. Parrella, 736 So.2d 94 (Fla. 4th DCA 1999), (defendant, who during single occurrence showed undercover detectives four different videotapes depicting sexual acts involving children, could be prosecuted only on one count of possessing child pornography with intent to promote, since applicable statute specified "any" violative material, rather than "a" piece of violative material); Campbell v. State, 586 So.2d 84 (Fla. 4th DCA 1991) (single occurrence of inmate's possession of excess currency was one offense, regardless of amount involved, under statute which prohibited possession of "any" currency; charging defendant with one count of possessing currency greater than $5 and second count of possessing currency greater than $30 violated double jeopardy).

RICO
In counts 1 and 2, the defendants were charged with racketeering and conspiracy to commit racketeering in violation of the Florida RICO (Racketeer Influenced and Corrupt Organizations) Act. Under the Act, "racketeering activity" is defined as follows:
(1) "Racketeering activity" means to commit, to attempt to commit, to conspire to commit, or to solicit, coerce, or intimidate another person to commit:
(a) Any crime which is chargeable by indictment or information under the following provisions of the Florida Statutes:
* * *
29. Chapter 817, relating to fraudulent practices, false pretenses, fraud generally, and credit card crimes. (emphasis added)
§ 895.02(1)(a)(29), Fla. Stat.
The state relied on the patient brokering incidents in violation of section 817.505 as the basis for the racketeering charges. Since section 817.505 does not require proof of fraudulent conduct, the trial court *399 concluded the patient brokering incidents would not qualify as racketeering activity. On appeal, the state argues the "relating to fraudulent practices, false pretenses, fraud generally ..." language was intended only to facilitate identification of the provisions of chapter 817 and was not intended to restrict the parts of chapter 817 which could be used to support a racketeering charge.
We disagree. An elementary principle of statutory construction provides that significance and effect must be given to every word, phrase, sentence, and part of the statute if possible, and words in a statute should not be construed as mere surplusage. State v. Bodden, 877 So.2d 680 (Fla.), cert. denied, 543 U.S. 1003, 125 S.Ct. 628, 160 L.Ed.2d 463 (2004); Hechtman v. Nations Title Ins. of New York, 840 So.2d 993 (Fla.2003). Construing the "relating to" language as merely referring to the chapter already listed would render that language superfluous.
We also decline to read any fraud element into section 817.505. Chapter 817 is entitled "Fraudulent Practices" and contains numerous sections, many of which require proof of fraud or intent to defraud. However, the chapter also contains other sections, such as patient brokering, which do not require fraud or intent to defraud.[8] The mere fact that section 817.505 was included in the fraudulent practices chapter does not mean the Legislature intended fraud to be an element of the statute. See State v. Bradford, 787 So.2d 811 (Fla.2001) (although it may be persuasive, the classification of a law in a particular title or chapter of Florida Statutes is not determinative on the issue of legislative intent).
Since the patient brokering acts do not relate to fraudulent practices, false pretenses or fraud generally, they will not support the racketeering charges. State v. Gusow, 724 So.2d 135 (Fla. 4th DCA 1998) (collection of an advance fee from borrower and loan broker fraud were not predicates to support RICO prosecution for committing crime "relating to interest and usurious practices" as offenses did not "relate to" interest and usurious practices); State v. Kessler, 626 So.2d 251 (Fla. 4th DCA 1993), rev. denied, 634 So.2d 627 (Fla.1994) (lewdness and assignation were not predicates to support RICO prosecution for committing crime "relating to prostitution").

White Collar Crime
In count 130, the defendants were charged with violating Florida's White Collar Crime Victim Protection Act, section 775.0844, by committing at least two white collar crimes, including patient brokering in violation of section 817.505. Section 775.0844(3) provides in part as follows:
775.0844. White Collar Crime Victim Protection Act
(3) As used in this section, "white collar crime" means:
(a) The commission of, or a conspiracy to commit, any felony offense specified in:
* * *
4. Chapter 817, relating to fraudulent practices.

* * *
(c) A felony offense that is committed with intent to temporarily or permanently *400 deprive a person of his or her property or that involves a conspiracy to temporarily or permanently deprive a person of his or her property.
(d) A felony offense that involves or results in the commission of fraud or deceit upon a person or that involves a conspiracy to commit fraud or deceit upon a person. (emphasis added)
The trial court concluded the patient brokering incidents do not constitute white collar crime because they do not require proof of fraudulent conduct. On appeal, the state points out that "Fraudulent Practices" is the title of chapter 817 and argues the "relating to fraudulent practices" language simply restates that title and was not intended to limit the crimes chargeable under chapter 817.
For the reasons discussed above, we again reject the state's argument. Construing the "relating to fraudulent practices" language as merely restating the title of chapter 817 would render that language superfluous.

Conclusion
We affirm the striking of the patient brokering incidents from counts 1, 2 and 130 as they do not relate to fraud. We affirm the dismissal of counts 3-55 on the basis that former section 409.920(1)(d) rendered section 409.920(2)(a) unconstitutional. Even though we uphold the constitutionality of section 817.505, we affirm the dismissal of counts 56-129 as multiplicitous.
AFFIRMED IN PART, REVERSED IN PART AND REMANDED.
PETERSON and ORFINGER, JJ., concur.
NOTES
[1] The state later entered a nolle prosequi as to Iliana Fernandez.
[2] Article VI, cl. 2, U.S. Constitution:

Clause 2. Supreme Law of Land
This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.
[3] The Medicaid program was enacted in 1965 as a cooperative federal-state endeavor designed to provide health care to needy individuals. The program provides federal financial assistance to states that choose to reimburse certain costs of medical treatment for needy persons. States are not required to participate in the program, but once a state chooses to adopt the program, it must establish a plan conforming with the requirements of the federal statute. Thompson v. Department of Children and Families, 835 So.2d 357 (Fla. 5th DCA 2003). See also State, Agency for Health Care Admin. v. Estabrook, 711 So.2d 161 (Fla. 4th DCA 1998) (Medicaid is a cooperative federal-state welfare program providing medical assistance to needy people).
[4] 18 U.S.C.A. § 287 False, fictitious or fraudulent claims

Whoever makes or presents to any person or officer in the civil, military, or naval service of the United States, or to any department or agency thereof, any claim upon or against the United States, or any department or agency thereof, knowing such claim to be false, fictitious, or fraudulent, shall be imprisoned not more than five years and shall be subject to a fine in the amount provided in this title.
[5] The information did not charge the defendants with violating section 817.505(1)(a). Nevertheless, sections 817.505(1)(a) and 817.505(1)(b) are similar and both prohibit engaging in any split-fee arrangement involving patient referrals.
[6] (b) Illegal remunerations

(1) whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind
(A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program,... shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.
(2) whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person
(A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, ... shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.
[7] 775.021. Rules of construction

(1) The provisions of this code and offenses defined by other statutes shall be strictly construed; when the language is susceptible of differing constructions, it shall be construed most favorably to the accused.
[8] These sections include sections 817.17 (Wrongful use of city name), 817.30 (Punishment for unlawful use of badge of certain orders and organizations), 817.31 (Unlawful use of insignia of American Legion), 817.311 (Unlawful use of badges, etc.), 817.35 (Sale of cemetery lots or mausoleum space; promises), 817.36 (Resale of tickets of common carriers, places of amusement, etc.), and 817.361(Resale of multiday or multievent ticket).