967 So.2d 768 (2007)
STATE of Florida, Appellant,
v.
John Anthony RUBIO, et al., Appellees.
No. SC06-157.
Supreme Court of Florida.
July 12, 2007.
As Revised on Denial of Rehearing October 18, 2007.
*770 Bill McCollum, Attorney General, Christopher M. Kise, Solicitor General, Louis F. Hubener, Chief Deputy Solicitor General, and James A. McKee, Deputy Solicitor General, Tallahassee, FL, for Appellant.
G. Richard Strafer, Miami, Florida, and Anthony C. Vitale, Miami, FL, for Appellees.
WELLS, J.
This case is before the Court on appeal from a decision of the Fifth District Court of Appeal, State v. Rubio, 917 So.2d 383 (Fla. 5th DCA 2005), which held a state statute to be invalid. This Court has jurisdiction under article V, section 3(b)(1) of the Florida Constitution.

FACTS AND PROCEDURAL HISTORY
The defendants were charged in a 130-count information. The counts were: (1) racketeering, in violation of section 895.03(3), Florida Statutes (2002); (2) conspiracy to commit racketeering, in violation of section 895.03(4), Florida Statutes (2002); (3-55) Medicaid provider fraud, in violation of section 409.920(2)(a), Florida Statutes (2002); (56-129) split-fee patient brokering, in violation of section 817.505(1)(b), Florida Statutes (2002); and (130) white collar crime, in violation of section 775.0844, Florida Statutes (2002).
The following facts were set out in the Fifth District's decision. Defendants Sonia Guzman and Anamaria Mendez are Miami dentists who were recruited to provide dental services in Orlando to Medicaid-eligible children. Guzman and Mendez billed Medicaid and then split the fees with defendants John Rubio and Gustavo Fernandez. Rubio and Fernandez solicited Medicaid-eligible children primarily from public housing areas and transported them to and from the clinic. Five Medicaid recipients were examined by a pediatric dentist, who found no evidence to support the claims submitted on their behalf. The defendants were charged with violation of the above statutes on October 27, 2003.
*771 According to the defendants, the fee arrangement was between their corporations. Rubio's company provided management services for the dentists, including marketing for the dental practice and handling the business aspects of the dental practice. Guzman and Mendez performed the clinical work. In return for getting a turnkey dental office and marketing, Rubio's company was paid between 42% and 43% of the compensation received by the dentists for their services.
The defendants moved to dismiss all charges. On February 1, 2005, following a hearing, the trial court granted the motion, dismissing all counts because it determined that the statutes under which the defendants were charged were unconstitutional, that the counts against the defendants were multiplicitous, and that a proper predicate for the racketeering and white collar crime charges was not established.
The State appealed this dismissal to the Fifth District Court of Appeal, which affirmed in part and reversed in part the trial court's decision. The Fifth District affirmed the trial court's decision that the Medicaid provider fraud statute, § 409.920(2)(a), is unconstitutional. Rubio, 917 So.2d at 392. The Fifth District found that the trial court erred in concluding that the patient brokering statute, § 817.505, is unconstitutional. Id. at 391. However, the Fifth District affirmed the trial court's dismissal of the patient brokering charges on the ground that they were multipicitous. The court found that under the statute, the defendants could only be charged for the arrangement between the defendants to split fees and not for each instance of fee-splitting. Finally, the Fifth District affirmed the trial court's dismissal of the racketeering and white collar crime charges. Id. at 399.
This case comes to this Court on the basis of its mandatory jurisdiction to review the Fifth District's determination that section 409.920(2)(a) is unconstitutional. However, both the State and the defendants have also raised issues in respect to each of the decisions in the Fifth District's opinion. In our review, we will consider whether (1) the Medicaid provider fraud statute is constitutional; (2) the patient brokering statute is constitutional; (3) the charges under the patient brokering statute were multiplicitous; and (4) there is a sufficient predicate for the charges of racketeering and white collar crime. Because each of these issues concern questions of statutory constitutionality or construction, we review each issue de novo. Tillman v. State, 934 So.2d 1263, 1269 (Fla.2006); State v. J.P., 907 So.2d 1101, 1107 (Fla.2004).

ANALYSIS

I. Constitutionality of Medicaid Provider Fraud Statute
In the information alleging violation of section 409.920(2)(a), the defendants were charged with on various dates knowingly making, causing to be made, or aiding and abetting the making of a claim for payment for dental services which were not rendered. The trial court's order granting the defendants' motion to dismiss on the ground that section 409.920(2)(a) is unconstitutional states that the trial court's ruling is as to the issue of law and not on the basis of findings of fact. State v. Rubio, No. 48-2003-CF-13501-O (Fla. 9th Cir. Ct. order dated Feb. 1, 2005) (Order). The Fifth District affirmed the motion to dismiss. The case is now presented for our review of whether the granting of the motion to dismiss on the constitutional ground was correct.
Section 409.920(2)(a) provides that it is unlawful to:
Knowingly make, cause to be made, or aid and abet in the making of any false *772 statement or false representation of a material fact, by commission or omission, in any claim submitted to the agency or its fiscal agent for payment.
At the time that the defendants were charged with violating this provision, "knowingly" was defined in section 409.920(1)(d) to mean that the act is "done by a person who is aware or should be aware of the nature of his or her conduct and that his or her conduct is substantially certain to cause the intended result."[1]
This issue is similar to the issue of constitutionality of section 409.920(2)(e) that this Court considered in State v. Harden, 938 So.2d 480 (Fla.2006), cert. denied, ___ U.S. ___, 127 S.Ct. 2097, 167 L.Ed.2d 812 (2007). In Harden, the defendants were charged with nine counts of conspiracy, racketeering, and Medicaid fraud under section 409.920(2)(e), Florida Statutes (2000). That section states that it is unlawful to:
Knowingly solicit, offer, pay, or receive any remuneration, including any kickback, bribe, or rebate, directly or indirectly, overtly or covertly, in cash or in kind, in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made, in whole or in part, under the Medicaid program, or in return for obtaining, purchasing, leasing, ordering, or arranging for or recommending, obtaining, purchasing, leasing, or ordering any goods, facility, item, or service, for which payment may be made, in whole or in part, under the Medicaid program.
This is known as the anti-kickback provision of the statute. The same definition of "knowingly" in section 409.920(1)(d) applies to both sections 409.920(2)(a) and 409.920(2)(e).
In Harden, the defendants argued that the Florida statute was preempted by the federal Medicaid anti-kickback statute, in part because the Florida statute's definition of the term "knowingly" conflicted with the federal mens rea requirement that the kickback occur knowingly and willfully. However, the defendants in Harden also based their preemption argument on the federal statute's twenty-two exceptions or "safe harbors" from the anti-kickback provisions that were not similarly excluded by the state statute. These safe harbor provisions include an exception for patient referrals occurring within a bona fide employment relationship. The defendants in Harden maintained that the alleged kickbacks were part of a bona fide employment relationship and thus could not be prosecuted under the federal statute.
In considering Harden, we reviewed the federal anti-kickback statute, noting that within the legislative history of the federal statute, it was clear that the purpose of the federal anti-kickback provision was to outlaw health care referrals that were unethical or inappropriate. Harden, 938 So.2d at 487-89. The federal statutory language for the anti-kickback provision originally had no mens rea requirement, though it was "primarily concerned with outlawing health care referrals that were considered unethical or inappropriate." Id. at 487. *773 Subsequent amendments added both a knowing and willful mens rea requirement, as well as the safe harbor provisions. These amendments were made because of health care providers' concerns that the statute was overbroad and punished conduct that while improper, was inadvertent. Id. at 487-89. We noted that although the federal statute did not provide for explicit preemption of the Florida anti-kickback statute, implied conflict preemption could still exist. We stated that we must "look to the statutory differences between the federal and state laws and determine whether these differences warrant conflict preemption." Id. at 490. We concluded that Florida's anti-kickback statute was preempted by the federal statute because it "criminalize[d] conduct that federal law specifically intended to be lawful and shielded from prosecution." Id. at 492-93. We continued:
There is clear congressional intent to exempt compensation paid by employers to bona fide employees for providing covered items or services from those remunerations that constitute prohibited kickbacks under the federal statute. The heightened mens rea of the federal statute also indicates a clear intent that negligent or inadvertent behavior does not subject an individual to prosecution under the federal statute.
Both the heightened mens rea requirement and the safe harbor provision are key elements in fulfilling the purpose of the federal anti-kickback statute, which is to outlaw health care referrals that are unethical. Accordingly, we agree with the Third District that the Florida anti-kickback statute is preempted because it presents an obstacle to the accomplishments of the purposes of the federal law.
Id. at 493.
The defendants in the present case repeat the argument that the charges based on the prohibition against filing a false statement in a claim for payment based upon section 409.920(2)(a) should be dismissed because this statute unconstitutionally conflicts with the federal false statements statute that contains the language "knowingly and willfully." The federal statute, 42 U.S.C. § 1320a-7b(a) (2000), imposes penalties on whoever:
(1) knowingly and willfully makes or causes to be made any false statement or representation of a material fact in any application for any benefit or payment under a Federal health care program (as defined in subsection (f) of this section),
(2) at any time knowingly and willfully makes or causes to be made any false statement or representation of a material fact for use in determining rights to such benefit or payment.
The defendants maintain that our holding the anti-kickback provision unconstitutional because of the reduced mens rea necessarily should apply to the false statement provision in this case.
The defendants' argument fails to take into account that we held in Harden that both the mens rea and the safe harbor provisions were "key elements" in fulfilling the purpose of the federal anti-kickback statute. 938 So.2d at 492. No similar safe harbor provisions are "key elements" in fulfilling the purpose of the false statement provisions. The intent of the false statement provisions is to protect Medicaid funds from depletion by paying false claims. There are no bona fide relationships built upon false statements in claims for payment.
As we expressly stated in Harden, for preemption to apply defendants must be able to show that any impediment to the purpose and objectives of the federal statute's purposes caused by the state statute must be "severe" and not merely *774 "modest." Pharm. Research & Mfrs. of Am. v. Walsh, 538 U.S. 644, 665, 123 S.Ct. 1855, 155 L.Ed.2d 889 (2003). This impediment must "seriously compromise important federal interests." Arkansas Elec. Coop. Corp. v. Arkansas Pub. Serv. Comm'n, 461 U.S. 375, 389, 103 S.Ct. 1905, 76 L.Ed.2d 1 (1983). We stated in Harden:
Federal preemption of a state law is "strong medicine," and is "not casually to be dispensed." [Pharm. Research & Mfrs. of Am. v. Concannon, 249 F.3d 66, 75 (1st Cir.2001)] (quoting Grant's Dairy [v. Comm'r], 232 F.3d [8,] 18 [1st Cir.2000]). This is especially true when the federal statute creates a program, such as Medicaid, that utilizes "cooperative federalism." "Where coordinated state and federal efforts exist within a complementary administrative framework, and in the pursuit of common purposes, the case for federal preemption becomes a less persuasive one." Id. (quoting Wash. Dep't of Soc. & Health Servs. v. Bowen, 815 F.2d 549, 557 (9th Cir.1987)); see also Pharm. Research & Mfrs. of America v. Walsh, 538 U.S. 644, 665, 123 S.Ct. 1855, 155 L.Ed.2d 889 (2003) ("The presumption against federal preemption of a state statute designed to foster public health has special force when it appears . . . that the two governments are pursuing common purposes.")
Harden, 938 So.2d at 486.
Prior to our decision in Harden, the Third District decided State v. Wolland, 902 So.2d 278 (Fla. 3d DCA 2005), which involved the issue of the constitutionality of the false statements prohibition of section 409.920(2)(a). In Wolland, the Third District distinguished its earlier decision in State v. Harden, 873 So.2d 352 (Fla. 3d DCA 2004), aff'd, 938 So.2d 480 (Fla.2006), and found that the false statements prohibition in section 409.920(2)(a) was constitutional. The Third District upheld the false statements provision, reasoning that the mens real concern in Harden was not the same in respect to false statements because "one cannot negligently `knowingly make . . . [a] false statement . . . in [a] claim submitted to the agency . . . for payment.'" Wolland, 902 So.2d at 284 (quoting § 409.920(2)(a)).
The Fifth District, in its opinion in the present case, issued prior to the release of our decision in Harden, acknowledged the decisions of the Third District in Wolland and Harden. The Fifth District disagreed with the Wolland decision and held that under the definition of "knowingly" in the statute, the defendants could be convicted for conduct that may be improper but was inadvertent and found that this definition was not consistent with what Congress intended. Rubio, 917 So.2d at 392.
While we do not agree with the reasoning of the Third District in Wolland that a prosecution of a violation of the false statements provision can proceed upon only proof of a negligent filing of a false statement in a claim for payment, we reject the Fifth District's conclusion that this means that the false statement provision is unconstitutional in the present case.
As noted earlier, our concern about the reduced mens rea is not combined here with a concern about safe harbor provisions. While the strong medicine of preemption was necessary in Harden because the state statute criminalized activities expressly protected in the federal law, no similar safe harbor provision exists in the statute regarding false statements to induce payments from federal health care programs.
The present case is only at the information stage of the proceedings. The charges are that the defendants filed claims for payment for dental services which were not performed and that, therefore, the claims for payment contained *775 false statements. If the proof is that the defendants "were aware" that the statements in the claims for payment were false, we do not believe that the prohibition in section 409.920(2)(a) is unconstitutional as to such conduct by the defendants.
The constitutionality of the false statement prohibition of section 409.920(2)(a) can and should be saved by severing the "should be aware" language from section 409.920(1)(d) as it pertains to section 409.920(2)(a). We have long recognized that if an unconstitutional provision of a statute can be severed so that the remaining provisions of the statute can be found to be constitutional, there should be a constitutionally saving severance. In State v. Calhoun County, 126 Fla. 376, 170 So. 883, 886 (1936) (citations omitted), we said:
It is a well-established principle of statutory construction that the language of a statute should be so construed as to preserve its constitutionality rather than to defeat it, and that if two apparently contradictory provisions exist in a statute, one being consistent with the limitations of the Constitution and another in violation of them, the latter should not control to strike down the statute; in other words, if a clause in the statute which is violative of the Constitution may be eliminated and the remaining portion of the act stand as a valid expression of the legislative will the clause violative of constitutional limitations will be eliminated and the act permitted to stand although there is no separability clause in the act.
. . . .
The authority of the court to eliminate from an act of the Legislature an invalid clause does not flow from legislative authority authorizing the court to do so, but from the inherent power of the court to preserve the constitutionality of the act if it is possible to do so even by the elimination of invalid clauses, where it appears that the elimination of such clauses would not destroy the main and essential features of the act and the portion left is a completed and workable statute and where it cannot be said that the Legislature would not have enacted the remaining portions of the act without the invalid clause which is stricken.
See also Schmitt v. State, 590 So.2d 404, 415 (Fla.1991) (portion of statute may be severed provided it meets four-part test that (1) unconstitutional provisions can be separated from valid provisions; (2) legislative purpose can be accomplished independently of provisions that are void, (3) good and bad features are not so inseparable that it can be said that the Legislature would have passed the one without the other; and (4) an act complete in itself remains after the invalid provisions are stricken). We apply this principle in this case in order to fulfill our obligation to preserve the constitutionality of the statute.
In the present case, the trial court granted a motion to dismiss the charges based upon the allegations that the defendants knowingly filed false statements for payment. We reverse the affirmance of the trial court's dismissal, with directions that the charges be reinstated. In order to prove the charges, the State is required to prove as an element of the offense that the defendant was "aware of the nature of his or her conduct and that his or her conduct is substantially certain to cause the intended result." By this decision we also adhere to the principle of preemption that "state law is displaced only `to the extent that it actually conflicts with federal law.'" Dalton v. Little Rock Family Planning Servs., 516 U.S. 474, 476, 116 S.Ct. 1063, 134 L.Ed.2d 115 (1996) (quoting Pacific Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n, 461 *776 U.S. 190, 204, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983)).
We disapprove the decision of the Third District in Wolland to the extent that it is in conflict with this decision.

II. Constitutionality of Patient Brokering Statute
In this issue, the defendants argue that section 817.505, Florida Statutes (2002), which prohibits "patient brokering," is unconstitutional because it (1) is vague; (2) lacks a mens rea requirement; and (3) fails to impose a mens rea requirement of willfulness. Counts 56-129 charged the defendants with split-fee patient brokering, in violation of section 817.505(1)(b)-(c).
The trial court held that the statute was unconstitutional, though it did not identify on what basis it reached this conclusion. The Fifth District reversed the trial court's holding, finding each of the defendants' arguments meritless, and concluded that the statute is constitutional. Rubio, 917 So.2d at 396. We affirm the Fifth District's decision holding the statute to be constitutional and adopt the Fifth District's reasoning on this issue.

III. Multiplicity
In this issue, the State contends that the Fifth District erred in dismissing counts 56-129, the patient brokering charges, and finding that the charges were multiplicitous. The prosecutor stated at the motion to dismiss hearing that the information was designed so that the defendants were charged with violating the statute "every single time" they did any act in furtherance of the arrangement to refer patients.[2] The defendants, in their motion to strike these charges, argued that the seventy-three counts were multiplicitous because the Legislature's use of the words "any" and "arrangement" in section 817.505 meant that charges could only be brought per arrangement and not per act committed in that arrangement. Again, no evidence has yet been presented or considered because this case is an appeal of an order granting the defendants' motion to dismiss prior to trial.
The trial court dismissed the charges as multiplicitous because the court found that section 817.505(1)(b) makes it a crime to "engage in any split-fee arrangement" regardless of the number of fee-splitting instances which occur; thus, "charging each fee-splitting instance as a separate and distinct crime results in a multiplicitous information." Order at 10. The Fifth District affirmed the trial court's dismissal, finding that the statute was meant to prohibit the agreement to refer patients to the dentists in return for a split of the fees. The Fifth District held that it could "discern no intent by the Legislature to criminalize each and every act done pursuant to the agreement." Rubio, 917 So.2d at 398. *777 "Where the defendants are charged with multiple violations of the same statute, as is the case here, the courts apply the `allowable unit of prosecution' standard to determine whether a double jeopardy violation has occurred." Id. at 397. The "allowable unit of prosecution" is defined as "the aspect of criminal activity that the Legislature intended to punish." McKnight v. State, 906 So.2d 368, 371 (Fla. 5th DCA 2005).
As the Fifth District's opinion reflects, we have dealt with issues of multiplicity several times, most recently in Bautista v. State, 863 So.2d 1180 (Fla.2003). In Bautista, we considered whether the State could charge the defendant with multiple counts of DUI manslaughter when multiple deaths occur in a single DUI incident. The defendant argued that he could not be charged with multiple counts of DUI manslaughter because the statute stated that one who causes "the death of any human being commits DUI manslaughter." § 316.193(3)(c)(3), Fla. Stat. (2002) (emphasis added). Bautista relied upon a test from our case law in arguing that while the use of the article "a" in a statute would indicate the Legislature's intent to impose punishment for each death, the use of the word "any" rendered the statute ambiguous and thus required the imposition of the rule of lenity, such that the statute should be interpreted to favor the defendant. Id. at 1182.
We rejected Bautista's claim. Our opinion traced the history of the "a/any" test, noting that several of our previous decisions had indeed relied solely on this test to determine the Legislature's intended unit of prosecution. However, we noted that in our initial decision on this matter in Grappin v. State, 450 So.2d 480 (Fla.1984), we had not simply applied the a/any test, but had instead adopted a "common-sense" approach to discerning the intended unit of prosecution. Bautista, 863 So.2d at 1183.
Following this precedent, we concluded:
Applying a common-sense approach to the DUI manslaughter statute leads to one inexorable conclusion. Any reasonable consideration of the language of the statute, the history of its enactment, the uniform statutory treatment of manslaughter offenses, and the case law in existence makes it clear that the legislative intent is that each death caused in a DUI crash is to be charged and punished as a separate offense.
Id. at 1187.
Regarding the a/any test, we stated:
The a/any test does not compel a contrary determination of the Legislature's intended unit of prosecution for the offense of DUI manslaughter. Bautista's argument based on the a/any test succeeds only if we were to apply the test as a simple syntactical rule in isolation from the context in which the test arose. However, it would be improper to so isolate this distinction. [n. 8] As discussed earlier, the a/any distinction was used in Grappin as one part of a common sense application of well-established rules of statutory interpretation, including reference to the overall statutory scheme and purpose as well as to related cases. Within this context, the a/any test is a valid linguistic tool that is helpful in establishing the Legislature's intended unit of prosecution. However, the a/any test is not an infallible or exclusive indicator of legislative intent. [n. 9] Rather, absent clear legislative intent to the contrary, the a/any test serves as a valuable but nonexclusive means to assist courts in determining the intended unit of prosecution.
[n. 8] In attempting to discern the intent behind a statutory term, courts should not mechanistically rely on a *778 single tool but must use all available tools of interpretation. See United States v. Dickerson, 310 U.S. 554, 562, 60 S.Ct. 1034, 84 L.Ed. 1356 (1940) (stating that "the meaning to be ascribed to [a legislative act] can only be derived from a considered weighing of every relevant aid to construction").
[n. 9] In fact, only if the criminal statute in question uses the article "a" is the legislative intent as to the intended unit of prosecution actually determined by the a/any test. This is because the use of the article "a" is unambiguous. If the adjective "any" is used, an ambiguity of legislative intent arises. Instead of using the traditional tools for determining legislative intent, the a/any test simply applies the rule of lenity to this ambiguity and precludes more than one unit of prosecution. This latter result avoids determining legislative intent rather than ascertaining that intent.
We acknowledge that our decision in [State v. Watts, 462 So.2d 813 (Fla. 1985),] while reaching the correct result, might appear to apply the a/any test mechanistically. We applied the a/any test in that case because there was no clear evidence of legislative intent to permit multiple units of prosecution. However, Grappin and its progeny should not be interpreted to suggest that the intended unit of prosecution is automatically rendered ambiguous whenever a statute uses the word "any." In the DUI manslaughter statute, the intent of the Legislature is clear. And since our purpose in construing a statutory provision is to give effect to legislative intent, the unit of prosecution in DUI manslaughter cases must be the number of victims killednot the number of DUI traffic violations. The a/any test should not be applied to create an ambiguity where none exists and then to reach a result contrary to clear legislative intent.
Id. at 1187-88.
Thus, in order to determine the intended unit of prosecution for section 817.505, we must look at the overall statutory scheme and language of the statute. While much is made by the parties and the lower court of the a/any test, it seems that the real difference in the State and defense positions is whether the statute prohibits the global arrangement for fee-splitting for patient referrals regardless of the number of times patients are referred or provided or whether the statute prohibits each time the patients are alleged in the information to have been referred or provided.
In looking at the whole subsection, the statute provides that it is unlawful to "[s]olicit or receive any commission, bonus, rebate, kickback, or bribe" or to "engage in any split-fee arrangement," in return for referring patients. The statute's express words indicate that it is the engaging in fee-splitting in return for referrals of patients that is prohibited. We conclude that the Fifth District's analysis misses the word "engage" in focusing on "arrangement" and holding that only one charge can be brought in this case. Section 817.505 does not simply prohibit split-fee arrangements but prohibits engaging in those arrangements. Black's Law Dictionary 570 (8th ed.2004) defines "engage" as "[t]o employ or involve oneself; to take part in; to embark on." Therefore, in accordance with the plain language of the statute, the State is not limited to prosecuting only the arrangement to refer patients. We find that the information bases its charges on the appropriate units of prosecution.
The defendants also argue that the charges brought in this case are multiplicitous, in violation of the double jeopardy clause, because the use of the term "any" *779 means that only one charge could be brought per fee-splitting arrangement under Bautista and its predecessors. However, those cases to which the defendants cite dealt with determining the number of charges that could be brought as a result of a single event. The issue in Bautista was whether a car crash could result in multiple DUI manslaughter convictions when multiple deaths occurred in that single car crash. Bautista, 863 So.2d at 1185 (holding "that the Legislature clearly intended to permit multiple convictions based on multiple deaths arising from a single DUI incident.") (emphasis added). In several of the other cases in which the a/any test was employed, the crime was one of possession, and the question was how many charges could be brought for a single instance of possession of multiple items of contraband. See, e.g., State v. Watts, 462 So.2d 813 (Fla.1985).
However, the underlying information in the instant case did not charge crimes occurring in a single event. Rather, each count references a different date. These different dates reflect that the State has brought charges for different patient brokering activities. Whether on those dates the defendants actually did take part in a split-fee arrangement in return for the referral of patients is a question for the trier of fact.
We reverse the Fifth District's decision on this issue and hold that the information charged the correct units of prosecution, in accordance with section 817.505.

IV. Predicate Offenses
The trial court struck counts 1 (racketeering), 2 (conspiracy to commit racketeering), and 130 (white collar crime) from the information, finding that section 817.505 was not a proper predicate on which the State could charge racketeering and white collar crime. The Fifth District affirmed this decision. Rubio, 917 So.2d at 399-400.

A. Racketeering
The defendants were charged with violating section 895.03(3), Florida Statutes (2002) (the "RICO" statute), which provides: "It is unlawful for any person employed by, or associated with, any enterprise to conduct or participate, directly or indirectly, in such enterprise through a pattern of racketeering activity or the collection of an unlawful debt." The defendants were also charged with conspiracy to commit racketeering, which is prohibited by section 895.03(4), Florida Statutes. The relevant definition of racketeering (and point of contention in the instant issue) is found in section 895.02, Florida Statutes (2002), and provides:
(1) "Racketeering activity" means to commit, to attempt to commit, to conspire to commit, or to solicit, coerce, or intimidate another person to commit:
(a) Any crime which is chargeable by indictment or information under the following provisions of the Florida Statutes:
. . . .
26. Chapter 817, relating to fraudulent practices, false pretenses, fraud generally, and credit card crimes.
The defendants argue that although the patient brokering statute falls within chapter 817, it is not an appropriate predicate for a racketeering charge because it does not require that the accused have committed fraud in order to be convicted of patient brokering. Thus, the defendants' argument is that section 895.02(1)(a)(26) limits its predicate offenses to only those sections that include the elements of fraud by including the "relating to fraudulent practices, false pretenses, fraud generally, and credit card crimes" language. The trial court agreed and dismissed counts 1 and 2 against the defendants. The Fifth District affirmed the dismissal, holding that the "relating *780 to" language in section 895.02(1)(a)(26) meant that only those provisions under chapter 817 that required fraud as an element of the crime prohibited were to be considered valid predicate offenses. The court noted: "Construing the `relating to' language as merely referring to the chapter already listed would render that language superfluous." Rubio, 917 So.2d at 399.
The State argues that the Fifth District misread the plain language of the RICO statute. The State notes that the words following "relating to" in section 895.02 are the titles of the various parts of chapter 817: "Fraudulent Practices; False Pretenses and Frauds, Generally; and Credit Card Crimes." The State maintains, therefore, that those words are simply used to describe the chapters which the statute references and are not intended to limit the chapters in any way.
Indeed, section 895.02 includes a "relating to" provision for each of its subsections, often either the title of the section or chapter to which it cites. Chapter 817 is entitled Fraudulent Practices and includes three parts: part 1, False Pretenses and Frauds, Generally; part 2, Credit Card Crimes; and part 3, Credit Service Organizations. However, we also consider that section 895.02 uses the "relating to" language in regard to chapters in which there are different crimes set out and it is unclear that the crimes that are not stated are intended to be included in section 895.02. For example, section 895.02(1)(a)(9) sets forth as a predicate offense "[c]hapter 550, relating to jai alai frontons." The immediately preceding subsection, section 895.02(1)(a)(8), sets forth "[s]ection 550.235, s. 550.3551, or s. 550.3605, relating to dogracing and horseracing." If the entirety of chapter 550, which is titled "Pari-Mutuel Wagering," was to be included by the reference in section 895.02(1)(a)(9), then the specification of particular sections in section 895.02(1)(a)(8) was unnecessary. Another example is section 895.02(1)(a)(18), which sets forth as a predicate offense "[c]hapter 784, relating to assault and battery." Chapter 784 is titled "Assault and Battery; Culpable Negligence." From this subsection it is not clear that culpable negligence is to be considered a predicate offense to racketeering.
We agree with the Fifth District and the trial court on this issue and affirm the Fifth District's decision dismissing the racketeering charges (counts one and two) of the information, which are based on violations of chapter 817, Florida Statutes.

B. White Collar Crime
The defendants raised similar challenges to count 130 in the information, which charged the defendants with violating section 775.0844, the White Collar Crime Victim Protection Act. The defendants argued that section 817.505 was not a proper predicate upon which to base the white collar crime charge. The trial court again agreed and dismissed this count. Section 775.0844(2), Florida Statutes (2002), provides:
Due to the frequency with which victims, particularly elderly victims, are deceived and cheated by criminals who commit nonviolent frauds and swindles, frequently through the use of the Internet and other electronic technology and frequently causing the loss of substantial amounts of property, it is the intent of the Legislature to enhance the sanctions imposed for nonviolent frauds and swindles, protect the public's property, and assist in prosecuting white collar criminals.
Section 775.0844(3)(a)(4) provides that white collar crime means the commission or conspiracy to commit any felony offense specified in "[c]hapter 817, relating to fraudulent practices."
*781 The Fifth District affirmed the trial court's dismissal of this charge for the same reasons that it affirmed the dismissal of the racketeering charges. Rubio, 917 So.2d at 400. For the reasons set forth in the analysis in the prior section of this opinion concerning the RICO predicate issue, we affirm the Fifth District's decision on this issue.

CONCLUSION
Thus, we reverse the Fifth District's determinations that section 409.920(2)(a) was unconstitutional and that the indictment was multiplicitous. We affirm the remainder of the Fifth District's decision. We remand to the trial court for further proceedings consistent with this opinion.
It is so ordered.
LEWIS, C.J., and ANSTEAD, PARIENTE, QUINCE, CANTERO, and BELL, JJ., concur.
NOTES
[1] This definition has since been amended by the legislature and now reads:

"Knowingly" means that the act was done voluntarily and intentionally and not because of mistake or accident. As used in this section, the term "knowingly" also includes the word "willfully" or "willful" which, as used in this section, means that an act was committed voluntarily and purposely, with the specific intent to do something that the law forbids, and that the act was committed with bad purpose, either to disobey or disregard the law.
§ 409.920(1)(d), Fla. Stat. (2005).
[2] Thus, the State argued that its information charged defendants "every time patients [were] referred, claims submitted, and the fee split." Brief of Appellant at 25. The State further explained at the motion hearing on October 29, 2004, that the information breaks up the charges in a weekly manner, because the actions of referring patients, submitting claims, and splitting feesthese entire transactions happened on a weekly basis. For instance, count 56 in the indictment states that defendant Rubio, "on or about between June 27, 2001 and July 3, 2001 . . . did refer and/or provide patients to Bonilla's Medical and Dental center, and/or Anamaria Bonilla Mendez and/or Sonia Maria Guzman in exchange for an approximate 50% split-fee, less operating expenses, in violation of Florida Statute 817.505(b)." Count 57 then states that defendant Rubio, "on or about between July 4, 2001 and July 10, 2001 . . . did refer and/or provide patients to Bonilla's Medical and Dental center, and/or Anamaria Bonilla Mendez and/or Sonia Maria Guzman in exchange for an approximate 50% split-fee, less operating expenses, in violation of Florida Statute 817.505(b)."