DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**STATE OF FLORIDA,**
Appellant,

v.

**MARK A. DESIMONE,**
Appellee.

No. 4D2022-2104

[February 14, 2024]

Appeal from the Circuit Court for the Fifteenth Judicial Circuit, Palm Beach County; Kirk C. Volker, Judge; L.T. Case No. 2018-CF-005145-AXXX-MB.

Ashley Moody, Attorney General, Tallahassee, and Lindsay A. Warner, Assistant Attorney General and Melynda L. Melear, Senior Assistant Attorney General, West Palm Beach, for appellant.

Bruce A. Zimet of Bruce A. Zimet, P.A., West Palm Beach, for appellee.

**ON MOTION FOR REHEARING**

WARNER, J.

We deny the appellee's motion for rehearing, vacate our prior opinion, and substitute the following in its place.

The State appeals the dismissal of four counts of an information charging appellee Desimone with violations of section 817.505(1)(a), Florida Statutes (2016) (The Patient Brokering Act), which prohibits payments to an entity or person for referring patients to a health care provider. After an evidentiary hearing, the trial court dismissed the four counts, finding that while the counts alleged payments to one corporation, the payments were made for the same tests conducted on the same patients on the same date as payments made to another entity for those same patient referrals. Because of this, the trial court determined that the payments constituted one violation of the statute for each day alleged. We hold that the trial court erred by holding an evidentiary hearing to determine disputed issues of fact which were for the jury to determine. We

also conclude, based upon the allegations in the information, that the statute allowed the State to bring these multiple charges because the unit of prosecution pursuant to section 817.505(1)(a) is each payment made to induce the referral of patients or patronage. Therefore, we reverse.

## The Patient Brokering Act

The State charged appellee Desimone with thirteen counts of violating section 817.505(1)(a), Florida Statutes (2016) (The Patient Brokering Act). That section provides:

> (1) It is unlawful for any person, including any health care provider or health care facility, to:
>
> (a) Offer or pay any commission, bonus, rebate, kickback, or bribe, directly or indirectly, in cash or in kind, or engage in any split-fee arrangement, in any form whatsoever, to induce the referral of patients or patronage to or from a health care provider or health care facility[.]

*Id.*

In *State v. Rubio*, 967 So. 2d 768 (Fla. 2007), our supreme court determined the allowable unit of prosecution under section 817.505(1)(b), which prohibits receiving payment for patient referrals. In *Rubio*, the defendant was charged with multiple counts based upon a fee-splitting agreement with two health care providers. *Id.* at 770. The defendant received a percentage of each payment received by the health care providers from each patient. *Id.* at 771. Thus, the defendant had a true fee-splitting agreement with the health care providers, and the charges against the defendant each involved a different patient on different dates. The supreme court concluded that the statute did "not simply prohibit split-fee arrangements but prohibit[ed] engaging in those arrangements . . . . [I]n accordance with the plain language of the statute, the State is not limited to prosecuting only the arrangement to refer patients." *Id.* at 778.

The question presented in this case is how the statute should be applied in section 817.505(1)(a), when a health care provider pays multiple commissions to different parties for referrals of the same patients on the same dates.

## Facts

2

Safe Harbour Recovery Treatment Center (Safe Harbour) was a substance abuse treatment facility that regularly sought to have urine samples of its patients tested. Appellee Desimone was associated with Impact Q Laboratory, a lab that tested patient urine samples and then received payment for the tests from the patient's insurance company. Impact Q is a health care provider within the meaning of the Act. Another individual involved in the alleged patient brokering scheme, John Rizzo, received commissions from Impact Q/Desimone for bringing patients from Safe Harbour to Impact Q for testing. Those payments were made to two entities which Rizzo controlled: Southern Transfer and Idamia.

Rizzo originally had an agreement in early 2016 with a lab in New Orleans to provide them with patients' urine analysis cups from Safe Harbour, and he received a percentage of insurance claims' receipts from that lab. In the spring of 2016, Rizzo met with Desimone, who advised Rizzo that he was opening a lab, Impact Q. Rizzo agreed to bring the Safe Harbour urine samples to Impact Q for urine analysis, and in return Impact Q agreed to pay Rizzo's two companies from the insurance proceeds which Impact Q received for the lab services rendered to the Safe Harbour patients.

Operatives from Safe Harbour then sought payments for steering Safe Harbour's business to Impact Q. Rizzo put the operators in touch with Desimone to make a deal for payments from Desimone/Impact Q for the urine analysis business from Safe Harbour. After considering different methods to receive compensation, Safe Harbour operatives set up an entity called United Recovery Consultants, LLC (United) to receive payments. Impact Q made several payments to United as well as to Rizzo's companies. These arrangements led to the charges against Desimone.

The State alleged in thirteen counts that Desimone violated the Patient Brokering Act, for paying fees to Rizzo's companies and United Recovery Consultants on five different dates. For several of the dates, the State charged one count for a Rizzo company, and another count on the same date for a payment to the other Rizzo company or United. Desimone moved to dismiss the counts for multiplicity as to Rizzo's two corporations. The State agreed to consolidate the counts alleging payments to Rizzo's two corporations on the same dates.

Ultimately the State's amended information charged Desimone with nine counts: four for payments to United and five for payments to Rizzo's two corporations. The four payments to United were made on the same dates as four of the payments to Rizzo's corporations.

Desimone also moved to dismiss as multiplicitous the counts alleging payments to United, where payment to United was made for the same patients and on the same dates that payment was made to one of Rizzo's corporations, which were the subject of other counts of the information. Although the payments were for the same group of patient samples tested by Impact Q, the State claimed that Impact Q's payments to different corporations for the same referrals should constitute separate patient brokering violations. Thus, the State argued it could charge Desimone for each payment to United, a separate entity from the Rizzo corporations.

The trial court agreed with Desimone and granted the motion to dismiss as to multiplicity, finding persuasive that the payments were for the same patients and same tests. The court described the payments as "payments that are issued on the same date, for the same patients or patronage, but are allocated to different corporations, or are in essence, 'installment payments[.]'" Pursuant to *Rubio*, the court found that only one violation could be charged for payments made for the same date of service.

In moving for rehearing, the State claimed that the court went beyond the four corners of the information to evaluate the arrangements between the parties. The State argued that this was an issue for trial as to the type of arrangements between Impact Q, Rizzo, and United, because the State contended that each entity had a separate agreement with Impact Q and received separate payments.

Over the State's objection, the court determined that it could hear evidence outside the four corners of the information regarding the arrangements between Impact Q and the corporations. At the evidentiary hearing, various agreements between Impact Q and the corporations were introduced, and a United representative as well as Rizzo testified regarding their respective arrangements with Impact Q. Each corporation had a separate "marketing" agreement with Impact Q, which set different compensation for each company. Rizzo's corporations received an annual fee, with monthly installments plus a potential for incentive compensation. United's agreement did not state any annual compensation but permitted United to receive up to $75,000 in "discretionary incentive compensation." The witness from United described the arrangement as getting a "cut" of the Impact Q monies. The United witness also testified that Rizzo was separate from United and never got part of United's payments, as each entity had its own arrangement with Impact Q.

At the end of the evidentiary hearing, the trial court determined:

It is clear that a global split fee arrangement existed between Safe Harbour, John Rizzo and Impact Q for the referral of Safe Harbour patient urine samples to Impact Q for testing . . . . [O]n the four occasions that Impact Q made payments for Safe Harbour referrals, both Safe Harbour operatives and John Rizzo received their "cut" for the referral and brokering the referral of Safe Harbour patient urine tests to Impact Q. It is the Court's finding that the "allowable unit of prosecution" does not permit separate prosecutions based on Impact Q payments made to the source of the urine sample referrals and the broker or middleman of the urine sample referrals when the payments are made on the same date, for the same urine samples, and the same urine testing.

The court then dismissed the four counts alleging payments to United Recovery, thus leaving five counts against Desimone for payments to Rizzo's corporations. From this order, the State appeals.

## Analysis

The State first contends that the trial court erred by holding an evidentiary hearing on Desimone's motion to dismiss to determine the unit of prosecution for section 817.505(1)(a), Florida Statutes (2016). Desimone filed a motion to dismiss pursuant to Florida Rule of Criminal Procedure 3.190(b), arguing that the court should dismiss for multiplicity the several counts of the information. Desimone did not bring a motion pursuant to Florida Rule of Criminal Procedure 3.190(c)(4), and the motion was not sworn. As a result, the State made no traverse to the motion.

The Rules of Criminal Procedure do not provide for an evidentiary hearing on a motion to dismiss, although a trial court may hold an evidentiary hearing to establish certain facts in determining a rule 3.190(c)(4) motion. *See* Fla. R. Crim. P. 3.190(d). Evidentiary hearings have been authorized in some contexts under Rule 3.190(b), including those involving statutory immunity pursuant to the Stand Your Ground statute, transactional or use immunity, and prosecutorial misconduct. *See Dennis v. State*, 51 So. 3d 456, 462–63 (Fla. 2010) (evidentiary hearing required for motion to dismiss pursuant to rule 3.190(b) based on Stand Your Ground immunity); *State ex rel. Hough v. Popper*, 287 So. 2d 282, 285 (Fla. 1973) (issuing writ to compel trial court to hold an evidentiary hearing to determine if the transactional immunity or use immunity provisions of section 914.04, Florida Statutes, were applicable); *Owen v. State*, 443 So. 2d 173, 175 (Fla. 1st DCA 1983) (holding that trial court had discretion to conduct an evidentiary hearing on a motion to dismiss

alleging prosecutorial misconduct and selective prosecution); *State v. Yatman,* 320 So. 2d 401, 402 (Fla. 4th DCA 1975) (directing trial court to allow the defendant to file a written motion to dismiss and to "hold a hearing to determine the issues" regarding whether the defendant involuntarily waived his immunity). This case does not fall into any of those categories.

On a motion to dismiss, the supreme court in *Rubio* determined de novo the unit of prosecution as to section 817.505(1)(b), Florida Statutes. The supreme court made note that "no evidence ha[d] yet been presented or considered because this case [wa]s an appeal of an order granting the defendants' motion to dismiss prior to trial." *Rubio*, 967 So. 2d at 776. The *Rubio* court clearly signaled that an evidentiary hearing was not required.

We agree that the court should not have based its determination of the unit of prosecution upon disputed issues of fact. The evidentiary hearing showed a dispute as to the type and nature of the arrangements between the corporations and Impact Q. Because disputed issues of fact were present, those fact questions should have been decided at trial. The court erred in making the factual determinations in a pretrial evidentiary hearing.

Nevertheless, the State's briefs do not dispute that the payments from Impact Q to United and Rizzo were for referral of the same Safe Harbour patients on the same four days. Nor is there any dispute that United and Rizzo separately negotiated their agreements for payment with Impact Q. *See Rubio*, 967 So. 2d at 776 (determining the unit of prosecution while noting that no evidence had been presented or considered as the case was at the motion to dismiss stage).

Thus, we are able to address the question presented in this appeal: whether payments paid to different entities for referrals of the same patients on the same days can be charged as different violations of the Patient Brokering Act, or whether such payments constitute only one violation for each day. We conclude that such payments may be separately charged, because the correct unit of prosecution pursuant to section 817.505(1)(a) is each payment made to induce the referral of patients or patronage.

The Fifth Amendment double jeopardy clause protects against multiple punishments for the same offense. *State v. Losada,* 175 So. 3d 911, 912 (Fla. 4th DCA 2015) (citing *Ohio v. Johnson*, 467 U.S. 493, 498, 104 S. Ct. 2536, 81 L. Ed. 2d 425 (1984)). "If a defendant is charged with more than

one count of the same statutory offense, the 'allowable unit of prosecution' standard applies" to determine if the charges are multiplicitous. *Id.*; *State v. Johnson*, 343 So. 3d 46, 47–48 (Fla. 2022). When the court is faced with the question of whether charges under one statute are multiplicitous, like in the instant case, the court must first determine the permissible unit of prosecution. *Johnson*, 343 So. 3d at 47; *Rubio*, 967 So. 2d at 777. "Unit of prosecution" refers to "the aspect of criminal activity that the legislature intended to punish." *Rubio*, 967 So. 2d at 777 (quoting *McKnight v. State*, 906 So. 2d 368, 371 (Fla. 5th DCA 2005)); *Johnson*, 343 So. 3d at 48 (same). "[I]t is a distinguishable discrete act that is a separate violation of the statute." *McKnight*, 906 So. 2d at 371.

In *Rubio*, the supreme court addressed the question of the unit of prosecution and multiplicity in connection with section 817.505(1)(b) which makes it unlawful for a person to solicit or receive "*any* commission . . . or engage in *any* split-fee arrangement" for patient referrals. 967 So. 2d at 776. The court noted that the State charged defendants "every single time" "they did any act in furtherance of the arrangement to refer patients." *Id.* The court considered the application of the "a/any" test to determine whether the Legislature intended to allow multiple offenses or a singular unit of prosecution. *Id.* at 777. The use of the word "any" in section 817.505(1)(b) had led the Fifth District to affirm the trial court's dismissal of charges because the Fifth District held it could "discern no intent by the Legislature to criminalize each and every act done pursuant to the agreement." *Id.* at 776 (quoting *State v. Rubio*, 917 So. 2d 383, 398 (Fla. 5th DCA 2005)). The supreme court disagreed, noting that the "a/any test" to determine legislative intent should not be applied mechanically. Instead, the court stated a "common-sense approach" should be followed to discern the intended unit of prosecution. *Rubio*, 967 So. 2d at 777 (quoting *Bautista v. State*, 863 So. 2d 1180, 1183 (Fla. 2003)). *Rubio* concluded that to determine the intended unit of prosecution for section 817.505, it had to "look at the overall statutory scheme and language of the statute." *Id.* at 778.

The supreme court then observed that the statute made it unlawful to "'*[s]olicit or receive* any commission, bonus, rebate, kickback, or bribe' or to '*engage* in any split-fee arrangement,' in return for referring patients." *Id.* "The statute's express words indicate[d] that it is the engaging in fee-splitting in return for referrals of patients that is prohibited." *Id.* The supreme court concluded that the appropriate unit of prosecution was not the arrangement to refer patients, but "engaging in those arrangements." *Id.*

As to the defendants' claim that only one charge could be brought per fee splitting arrangement because the statute used the term "any" fee split arrangement, the supreme court stated:

> [T]he underlying information in the instant case did not charge crimes occurring in a single event. Rather, each count references a different date. These different dates reflect that the State has brought charges for different patient brokering activities. Whether on those dates the defendants actually did take part in a split-fee arrangement in return for the referral of patients is a question for the trier of fact.

*Id.* at 779. The court then held that the unit of prosecution under section 817.505(1)(b) constituted each time the patients were referred to the health care providers. *Id.*

In this case, the trial court looked to this language in *Rubio* and concluded that the State was precluded from charging Desimone for the separate payments to the Rizzo corporations and United for the same patient referrals on the same dates.

We find that the trial court, however, applied a mechanistic analysis, rather than *Rubio*'s "common sense" analysis. The trial court focused on the word "engage" with respect to a split-fee arrangement as used in both sections 817.505(a) and (b) as the *Rubio* court did. However, the statutory analysis required by *Rubio* to determine the unit of prosecution requires consideration of the "whole subsection" and "look[ing] at the overall statutory scheme and language of the statute." 967 So. 2d at 778. Here, if the payments are considered commissions or kickbacks, rather than a split fee arrangement, then section 817.505(a) provides that it is a violation to pay "**any** commission" or "kickback." *See* § 817.505(1)(a), Fla. Stat. (2016) (emphasis added). If the payment is truly a split fee arrangement, then the health care provider violates the statute any time it "engage[s] in any split-fee arrangement."

"To discern legislative intent, courts must consider the statute as a whole, including the evil to be corrected, the language, title, and history of its enactment, and the state of law already in existence on the statute." *McKnight*, 906 So. 2d at 371 (quoting *Bautista*, 863 So. 2d at 1186). When determining the "unit of prosecution," the focus is directed to "the aspect of criminal activity that the Legislature intended to punish." *Rubio*, 967 So. 2d at 777 (quoting *McKnight*, 906 So. 2d at 371).

Section 817.505(1)(a), unlike section 817.505(1)(b) at issue in *Rubio*, is directed at the payer or offeror who "induce[s]" the referral of patients or patronage. The overall evil is patient brokering, but specifically as to Desimone, as a health care provider, the evil to be corrected pursuant to section 817.505(a) is paying third parties to refer patients to the health care provider. Focusing on the act of paying commissions, Desimone's payments to Rizzo and separately to United induced both to be players in the referral of patients or patronage to Impact Q. A definition of "pay" is "to make due return to for services rendered or property delivered" and another for "pay" is "to give in return for goods or service." *See* Pay, Merriam- Webster's Dictionary, https://www.merriam- webster.com/dict ionary/pay (last visited on February 9, 2024). Here, Desimone was charged with specific payments by separate checks to Rizzo and to United in return for referrals.

Thus, even though the State conceded that the payments were for the same patients, Desimone paid each player, Rizzo and United, to induce each player to refer to Desimone/Impact Q patients for lab testing. Section 817.505(1)(a) prohibits Desimone from inducing referral or patronage, which inducement is made by each payment, on each date, to Rizzo or United.

Because the focus is on the payor in section 817.505(1)(a), not the payee as in *Rubio*, the fact that the payments are for the referral of the same patients for the same lab tests is not material. If a provider has to pay two parties to obtain patient referrals, the provider is twice entering into deals to broker the patients. Logically, any person, health care provider, or facility making several deals to induce the same referrals or patronage is engaging in more prohibited behavior pursuant to section 817.505(1)(a) than the person, health care provider, or facility which makes only one deal to induce referrals or patronage. For that reason, the "common sense" unit of prosecution under section 817.505(1)(a) is each payment made to induce the referral of patients or patronage.

## Conclusion

For the foregoing reasons, the unit of prosecution under section 817.505(1)(a), Florida Statutes (2016), is each payment made to induce the referral of patients or patronage. Thus, the State properly charged Desimone for the separate payments to Rizzo and to United, as each payment was used to induce the referral of patients or patronage. Accordingly, the trial court erred in granting the motion to dismiss as to Counts 1, 4, 6, and 9 as multiplicitous. We reverse and remand for reinstatement of the charges.

9

*Reversed and remanded.*

MAY and FORST, JJ., concur.

*      *      *

***Final Upon Release; No Motion for Rehearing Will Be Entertained.***